**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                   |     |                      |
|-----------------------------------|-----|----------------------|
| CHRISTOPHER NEAL ET AL.,          | *   |                      |
|                                   | *   |                      |
|     Plaintiffs, | *   |                    |
|                                   | *   |                      |
| v.                                | *   | Civil No. 24-0778-BAH |
|                                   | *   |                      |
| BRIAN FRAYER ET AL.,              | *   |                      |
|                                   | *   |                      |
|     Defendants. | *   |                    |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs Christopher Neal and Andre Linthicum (collectively "Plaintiffs") brought suit against Officer Brian S. Frayer ("Frayer"), individually and in his official capacity as a Mount Rainier police officer, and against the City of Mount Rainier ("Mount Rainier") (collectively "Defendants") alleging excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 (Count I) and in violation of Article 24 of the Maryland Declaration of Rights (Count V), battery (Count II), false imprisonment (Count III), and *respondeat superior* (Count IV). *See* ECF 1. The Court subsequently dismissed Counts I and IV of Plaintiffs' complaints against Mount Rainier. *See* ECF 21 (implementing order); ECF 20 (memorandum opinion). Pending before the Court are Frayer's motion to dismiss or in the alternative for summary judgment, ECF 22, and Mount Rainier's motion for summary judgment, ECF 24.[1] Plaintiffs filed an opposition to Frayer's motion, ECF 26, and to Mount Rainier's motion, ECF 27,[2] and Frayer filed a reply,

---

[1] Mount Rainier's motion for summary judgment "adopts and incorporates by reference the Motion for Summary Judgment filed by Defendant Frayer." ECF 24-1, at 1.

[2] Plaintiffs have not attached any exhibits to their oppositions. *See* ECF 26; ECF 27.

ECF 30.  All filings include memoranda of law, and Frayer's motion includes exhibits.[3]  The Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2025).  Accordingly, for the reasons stated below, Defendants' motions are **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

Plaintiffs' complaint arises out of an encounter between Plaintiffs and officers of the Mount Rainier police department on August 2, 2021.  ECF 1, at 1.  Just after 10:00 p.m., officers were dispatched to the 2300 block of Varnum Street in Mount Rainier, Maryland, to investigate a report of a woman screaming from inside a vehicle marked as "Special Police" and parked next to a gas station.  *See* ECF 22-1, at 1 ¶ 3 (Caplan affidavit).  Frayer and police officer Robert Caplan ("Caplan") were two of the responding officers.  *See* ECF 22-2, at 1 ¶¶ 4–5.  What happened next is largely captured on Caplan's body camera.  Frayer filed a copy of the footage from the camera, which is hereinafter referred to as the "Video Exhibit."  *See* ECF 23 (Frayer's motion for leave to file body camera footage); ECF 25 (order granting Frayer's motion).

Several Mount Rainier police officers were present at the scene.  ECF 22-1, at 1 ¶ 4.  The officers had parked their police vehicles facing a black and white car that was marked "Special Police."  *Id.*; Video Exhibit, at 00:30.  The doors of the car were closed and two men, later identified as Linthicum and Neal, were standing on the driver's side and near the trunk, respectively.  Video Exhibit, at 00:30–01:08.  Frayer approached Linthicum, asked for identification, and explained that the police were investigating reports of someone screaming.  ECF 22-1, at 1 ¶ 5; Video Exhibit, at 00:53–01:05.  Linthicum stated that he did not have any identification.  Video Exhibit, at 01:05–01:06.  Frayer then told Linthicum that he was not sure

---

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

what was going on and was detaining Linthicum while he continued the investigation. ECF 22-1, at 1–2 ¶ 5; Video Exhibit, at 01:06-01:21. Frayer then placed Linthicum's arms behind his back and handcuffed him. Video Exhibit, at 01:09–01:28. After Frayer handcuffed Linthicum, Frayer asked Linthicum who owned the vehicle with "Special Police" markings, and Linthicum responded that it was his vehicle. *Id.* at 01:30–01:33. Frayer asked Linthicum if he had a special police license, to which Linthicum responded that he did not. *Id.* at 01:33–01:36; ECF 22-1, at 2 ¶ 6. Frayer then told Linthicum "you know you can't be driving a car around like this, right?" and advised Linthicum that the vehicle would be impounded. Video Exhibit, at 1:37–1:46.

As Frayer was placing Linthicum in handcuffs, Caplan approached Neal, who was still standing near the rear of the vehicle and holding a cell phone up to his ear. *Id.* at 01:19–01:21. Caplan asked Neal for his identification and Neal responded, "my cousin's a cop, I'm about to call him right now." *Id.* at 01:21–01:30; ECF 22-1, at 2 ¶ 7. Caplan replied "okay" and stood to the side for approximately thirty seconds while Neal held his phone to his ear but did not appear to speak to anyone. *Id.* at 01:30–01:59. Caplan again approached the rear of the car where Neal was standing, tapped Neal on the back, and asked for Neal's identification a second time. *Id.* at 01:56–02:00. As Caplan stepped to the rear, he observed and grabbed two open containers of alcohol that were resting on the trunk, within arm's reach of Neal. *Id.* at 02:00–02:04; ECF 22-1, at 2 ¶ 7. Neal, still holding his cell phone to his ear but not appearing to be talking to anyone, turned to Neal and asked, "what do you need my ID for?" Video Exhibit, at 02:00–02:05. Caplan replied, "because we're doing an investigation, and I asked for your ID" and again repeated his request to see Neal's identification. *Id.* at 02:05–02:07. Neal again asked, "what do you need my ID for?" and said, "you have to tell me." *Id.* at 02:09–02:12. Throughout the exchange, Neal continued to hold his phone up to his ear and did not produce his identification. *Id.* at 02:00–02:15. Caplan

then picked up the alcohol containers, walked toward the front of the car, and placed the containers on the hood of the car. *Id.* at 02:11–02:20.

When Neal asked why Caplan needed to see his identification for the second time, Frayer interjected and said, "because he's a law enforcement officer and he asked for it." *Id.* at 02:12–02:14. Neal reiterated that he was calling a cousin on the police force and did not produce his identification. *Id.* at 02:15–02:17. As Caplan turned back to the rear of the car where Neal and Frayer were still standing, Frayer told Neal to put his hands behind his back. *Id.* at 02:22. Frayer began moving Neal's left hand behind his body while Neal continued to hold his cell phone with his right hand. *Id.* at 02:23. Neal's arm appeared to stiffen in response as he failed to comply with the order to put his hands behind his back. *Id.* at 02:24.

Frayer then turned Neal to face the car and twisted his left arm behind his back, prompting Neal to briefly yell. *Id.* at 02:24–02:26. Caplan then approached both men, saying "calm down, calm down," placed handcuffs on Neal's right wrist, took his phone out of his right hand, and placed Neal's right arm behind his back. *Id.* at 02:27–02:34. Frayer raised his voice at Neal and remarked that Caplan had "every lawful right" to ask for Neal's identification and that Neal was obligated "by law" to produce it. *Id.* at 02:34–02:38. Neal quietly responded by saying, "that's cool." *Id.* at 02:33–02:40. Caplan told Neal, "it wasn't that hard, sir," and again asked him to "calm down," and Neal again responded several times by saying "that's cool." *Id.* at 02:41–02:46. Once Neal was in handcuffs, Frayer released and stepped away from Neal. *Id.* at 02:43–02:44. Neal then faced Frayer and advised that when his cousin called back, he wanted Frayer's badge number, which Frayer provided. *Id.* at 02:47–02:51.

With both Neal and Linthicum detained in handcuffs, the two officers began going through both men's pockets. *Id.* at 02:49–03:05. As Caplan pulled a water bottle out of Neal's pocket;

Neal said, "that was excessive force." *Id.* at 03:04–03:11. Neal then said to Caplan, "I don't have nothing on me, man," to which Caplan responded, "well I'm going to find out, alright?" and Neal replied, "go ahead, do your job." *Id.* at 03:12–03:17. While Frayer and Caplan continued to search Neal and Linthicum, both detainees told Frayer, "you must be new around here." *Id.* at 03:18–03:27. Frayer asked the two men, "Why do you say that? Because I'm not afraid of you?" *Id.* at 03:27–03:29.

After the officers finished searching Neal and Linthicum, the officers reiterated that they had received reports of a woman screaming inside the car, which Neal and Linthicum responded was untrue. *Id.* at 03:46–03:50. Officers then opened the doors to the vehicle to search for any occupants. *Id.* at 03:51. Caplan's affidavit states that until Frayer searched the vehicle, the officers did not know whether there was a woman in the car as was reported in the call. ECF 22-2, at 3 ¶ 10. Meanwhile, Neal inquired into why Caplan had gone through Neal's wallet, and when Caplan responded loudly that he was looking for Neal's identification, Neal asked why Caplan was yelling. Video Exhibit, at 03:52–03:58. Caplan then replied, "you keep asking the same question," and continued, "it's not hard, sir, I asked you for your ID when I first came in; you don't want to give me your ID, not a problem, so I had to find your ID because you wouldn't give it to me." *Id.* at 03:58–04:10. While speaking, Caplan walked Neal to the front of the vehicle and sat him down on the hood. *Id.* at 04:10. The body camera footage provided as an exhibit in this case ends there. *Id.* at 04:20. Caplan's affidavit further provides that "Linthicum was cited for drinking in public," and that "[t]he entire investigation and issuance of the citation took approximately 31 minutes." ECF 22-2, at 3 ¶ 12.

### B.    Procedural Background

Plaintiffs originally filed suit in a related case, *Neal et al. v. Freyer et al.*, Civ. No. 22-1919-BAH,[4] on August 2, 2022.  That suit was filed against Caplan, Frayer, several unknown officers, Mount Rainier, and the Mount Rainier Police Department.[5]  *See* Civ. No. 22-1919-BAH ECF 1, at 1.  However, "[d]ue to issues effectuating service on Frayer, he was dismissed" from that action without prejudice.  *Neal v. Caplan*, Civ. No. 22-1919-BAH, 2025 WL 608191, at *1 n.1 (D. Md. Feb. 25, 2025); *see also Neal v. Frayer*, No. CV 24-0778-BAH, 2025 WL 621984, at *1 (D. Md. Feb. 26, 2025) (explaining how Plaintiffs failed to effectuate service on Frayer in the prior case).  In the related case against Caplan, the Court ultimately granted summary judgment in favor of the Defendants as to all claims.  *See generally Caplan*, 2025 WL 608191.

Plaintiffs filed a separate suit against Frayer and Mount Rainier on March 15, 2024.  *See* ECF 1.  On February 26, 2025, the Court denied Frayer's motion to dismiss and granted in part and denied in part Mount Rainier's motion to dismiss.  *See* ECF 21 (order); ECF 20 (memorandum opinion).  *See generally Neal v. Frayer*, Civ. No. 24-0778-BAH, 2025 WL 621984 (D. Md. Feb. 26, 2025).  The Court dismissed Plaintiffs' respondeat superior claim, Count IV, because it does not constitute an independent cause of action.  *Id.* at *4.  Relatedly, the Court dismissed Count I as brought against Mount Rainier because "a suit against a municipality for unconstitutional

---

[4] Unless otherwise noted, as is the case here, citations to the record are to the present case, not the prior one.  Because Frayer's name was originally misspelled in the Plaintiffs' complaint, Civ. No. 22-1919-BAH ECF 1, it remains misspelled on the docket and in the case citation.

[5] The Mount Rainier Police Department was also dismissed as a defendant from the prior case because it is a municipal police department and thus is not an entity subject to suit.  *See* Civ. No. 22-1919-BAH ECF 13, at 2 (letter order).  The Court also dismissed Plaintiffs' count styled as a respondeat superior claim "because respondeat superior is a theory of liability, not an independent cause of action."  *Id.* (quoting *Sterling v. Ourisman Chevrolet of Bowie Inc.*, 943 F. Supp. 2d 577, 601 (D. Md. 2013)).

conduct can only be brought 'under the standard set forth in *Monell*,'" not under § 1983 directly. *Id.* (quoting *Nicholson v. Balt. Police Dep't*, Civ. No DKC-20-3146, 2021 WL 1541667, at *10 (D. Md. Apr. 20, 2021)).  The Defendants now move to dismiss the remaining claims, or, in the alternative, for summary judgment.  All motions are ripe for review.

## II.    <u>LEGAL STANDARD</u>

A motion to dismiss styled in the alternative as a motion for summary judgment implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).  Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment.  *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).  When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious."  *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).

Frayer has captioned his motion to dismiss as an alternative motion for summary judgment, *see* ECF 22, and thus Plaintiffs "are deemed to be on notice that conversion under Rule 12(d) may occur."  *Laughlin*, 149 F.3d at 261.  Moreover, a party opposing the conversion of a motion to dismiss into one for summary judgment ordinarily must submit a Rule 56(d) affidavit setting forth their reasons, and the Fourth Circuit places "great weight" on the necessity of such an affidavit.

*Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996).  Plaintiffs have not filed such an affidavit, nor do they raise any arguments in their opposition against construing Frayer's motion as one for summary judgment.  *See* ECF 26.  Accordingly, the Court will construe Frayer's motion as a motion for summary judgment and will consider the attached exhibits.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists."  *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility

determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)).  For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion."  *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.  ANALYSIS

### A.  Claims Against Frayer

Defendants argue that "the issues in this case concerning Officer Frayer should be resolved by the same evidence and reasoning as the grant of summary judgment in favor of Officer Caplan in the prior case," because the officers are almost "identically situated" with respect to the claims. ECF 22-1, at 7–9.  Defendants suggest that "[t]he differences with Officer Caplan concerned Officer Frayer's handcuffing of Mr. Neal and Mr. Linthicum," and specifically Frayer's handcuffing of Neal.  ECF 22-1, at 8; *see also* ECF 1, at 5 ¶ 22 ("As Officer Frayer grabbed Mr. Neal's left arm, Officer Frayer put his free hand into Mr. Neal's back and forced him forward into a bending position. He simultaneously raised Mr. Neal's arm behind him in such a fashion that he caused significant pain.").

Plaintiffs argue that there are "[a]t least two critical distinctions [that] warrant denying . . . summary judgment."  ECF 26-1, at 5.  First, Plaintiffs argue that Frayer's individual conduct and degree of force are different from Caplan's.  *See id.* at 5–6.  Specifically, Plaintiffs argue that Frayer "physically twisted" both Plaintiffs' "arms behind their backs to an unreasonable degree" and "deliberately forced" Neal forward, "causing substantial pain and injuries that went well beyond a routine handcuffing."  *Id.* at 5.  Second, Plaintiffs observe that in the prior case, the Court "evaluated a record focused on Officer Caplan's body-camera footage and role," and a different record and evidentiary focus may warrant a different result.  *Id.* at 6.

The Court has thoroughly reviewed the record in this case, which is largely similar to that of the prior case.  The Court observes that Plaintiffs have not attached any exhibits or otherwise pointed to additional evidence to support their oppositions to Defendants' motions in this case.  As there are necessarily factual distinctions between the conduct of Caplan and Frayer during the August 2, 2021 encounter, the Court engages in an independent analysis of Frayer's conduct below.  Ultimately, however, summary judgment is warranted in Frayer's favor, for many of the same reasons articulated in the prior case against Caplan.

## 1.    Federal Claims

Pursuant to 42 U.S.C. § 1983, Plaintiffs bring a claim alleging excessive force in violation of the Fourth Amendment against Frayer.  ECF 1, at 7 (Count I).  Plaintiffs also allege a claim of "false imprisonment" against Frayer.  *Id.* at 10 (Count III).  As in the prior case, Plaintiffs fail to specify if they are bringing their claim of false imprisonment as a violation of federal or state law.  *See* ECF 1, at 10.  However, since false imprisonment can serve as a basis for a claim under § 1983, *see Wallace v. Kato*, 549 U.S. 384, 388 (2007), the Court considers this claim, along with Plaintiffs' excessive force claim, under the Fourth Amendment, and construes it as a claim alleging unlawful detention, *see Unus v. Kane*, 565 F.3d 103, 119 (4th Cir. 2009).

i.      *Unlawful Detention*

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. To that end, "a brief investigatory stop" of a citizen by police, also known as a *Terry* stop, "is impermissible unless the officer's action is supported by a reasonable and articulable suspicion, under all the circumstances, that criminal activity 'may be afoot.'" *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In determining whether an officer had reasonable suspicion to effectuate a stop, courts look to "the totality of the circumstances." *United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015). Though a mere "hunch" does not amount to reasonable suspicion, the standard is less demanding than probable cause. *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). However, the existence of reasonable suspicion is a "commonsensical proposition, [and] courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Foreman*, 369 F.3d 776, 782 (4th Cir. 2004) (internal quotation marks omitted).

Construing all evidence in favor of the Plaintiffs, the Court finds that there was reasonable suspicion to justify the detention of both Neal and Linthicum. As noted, the encounter at issue began when officers responded to a 911 call alleging that a screaming woman was locked inside a car marked "Special Police." *See* ECF 22-1, at 1 ¶¶ 3–5. While a "bare-boned, anonymous tip, standing alone, is insufficient to justify a *Terry* stop . . . the police may rely on an anonymous tip to establish reasonable suspicion if it is suitably corroborated so as to exhibit sufficient indicia of reliability." *United States v. Foster*, 824 F.3d 84, 92 (4th Cir. 2016) (cleaned up). Even an anonymous call may be deemed reliable if, among other elements, "it provides substantial detail about the individuals and the alleged criminal activity it describes." *United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007). Moreover, the Supreme Court has found that a 911 call, even one

placed anonymously, has greater inherent reliability than an anonymous tip made by other means. *See Navarette v. California*, 572 U.S. 393, 400 (2014). Because the 911 emergency system "has some features that allow for identifying and tracing callers" and the calls "can be recorded," it "provides some safeguards against making false reports with immunity." *Id.* at 400–01.

Here, not only were officers responding to a 911 call, but they were also alerted to, and looking for, a specific vehicle with identifiable "Special Police" markings, parked in a particular lot on Varnum Street in Mount Rainier. *See* ECF 22-1, at 1 ¶ 3. When Frayer and other officers arrived, undisputed video evidence reflects that they found a car that matched that description in the exact location detailed in the 911 call. Video Exhibit, at 00:30. Moreover, Neal and Linthicum exited the vehicle and locked and closed the doors, preventing the officers from seeing inside the darkly tinted windows.[6] *See id.*; *see also id.* at 3:51. The caller's use of the 911 emergency system, coupled with the amount of verifiable—and quickly verified—detail provided a sufficient basis for Frayer and other officers to permissibly conduct a *Terry* stop.

Even if the 911 call alone had not provided sufficient justification for the investigatory stop, the existence of other factors, considered in conjunction with the 911 call, established reasonable suspicion. Neal and Linthicum were arguably loitering in a public parking lot,[7] indicated that they were not licensed to drive the "Special Police" vehicle, and possessed open

---

[6] Plaintiffs' exit from the "Special Police" car is not depicted on the video. However, Plaintiffs do not contest, and did not contest in the prior case, that they were initially seated in the vehicle but then exited when police first arrived. *See* ECF 26; ECF 27. Additionally, the video reflects that Frayer had to unlock the car to access it. Video Exhibit, at 3:51.

[7] *See* Mount Rainier, Md., Ordinances' § 8-104 (2024) ("It shall be unlawful for any person to loiter . . . at a public place or place open to the public and to fail to obey the direction of a uniformed police officer or the direction of a properly identified police officer not in uniform to move on, when not to obey such direction shall endanger the public peace.").

containers of alcohol in a public place.[8]   Video Exhibit, at 00:30, 01:33–01:36, 02:00–02:04, 02:11–02:20; ECF 22-2, at 2 ¶¶ 6–7.   Indeed, the quick admission that neither had lawful authority to perform the duties of a "Special Police" officer, at minimum, justified their continued detention under *Terry*.   *See* Md. Code Ann., Pub. Safety § 3-315(a), (d) (providing that it is a misdemeanor offense "subject to imprisonment not exceeding 6 months" for "[a]n individual [to] exercise or attempt to exercise any of the powers of a special police officer . . . without a commission"); *see also Sizer v. State*, 174 A.3d 326, 329, 338 (Md. 2017) (finding that "under the totality of the circumstances, [] officers had reasonable suspicion to stop [a group of suspects] to investigate a possible open container violation" when officers observed a group "play fighting and passing around an alcoholic beverage back and forth").   More broadly, these facts substantiate the officers' perception that something was amiss.   *See United States v. Coleman*, 18 F.4th 131, 137 (4th Cir. 2021) (finding that even if a report alone would not support a *Terry* stop, finding "unusual activity" upon arrival at the scene reinforces reasonable suspicion).   Frayer's detention of Neal and Linthicum was therefore lawful and did not constitute a violation of the Fourth Amendment.

To the extent that Plaintiffs allege a Fourth Amendment violation based on a false arrest, this claim is also unavailing.   Though the probable cause standard required to effectuate an arrest differs from that of reasonable suspicion, the record suggests that Plaintiffs were not arrested.   "A *Terry* or investigative stop can cross the line and turn into an arrest under certain circumstances.

---

[8] It bears noting that the video reflects that Linthicum was already detained pursuant to *Terry* at the time police learned that Linthicum lacked a "Special Police" license and perhaps before officers observed the open containers of alcohol on the trunk of their car.   *See* Video Exhibit, at 01:06-01:21.   It is also clear from the video that at the time officers arrived, no woman could be heard "screaming from the inside of the vehicle," as the 911 caller had alleged.   *See id.* at 00:30–1:00. However, the windows of the vehicle were darkly tinted, and the car was locked, thus officers had reasonable suspicion to investigate the claims made in the 911 call.

The test for determining whether an individual is in custody or under arrest is whether, under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'"  *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).  Even if a suspect feels that they are not free to leave, that is "insufficient to convert a *Terry* stop into an arrest."  *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987).  "A brief but complete restriction of liberty is valid under *Terry*," even if effectuated through "use of force" or "handcuff[ing] suspects."  *Id.* (citing *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1987)); *see also United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes.").

Thus, the fact that the Plaintiffs were handcuffed during the detention is not sufficient to show that the investigatory stop turned into a full-blown arrest.  And in fact, more extreme showings of force have not transformed a *Terry* stop into a full-blown arrest.  *See, e.g.*, *United States v. Perate*, 719 F.2d 706, 709 (4th Cir. 1983) (blocking a limousine with police vehicles and drawing weapons was deemed a *Terry* stop, not an arrest).  Moreover, the video of the encounter reflects that the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (noting that such a consideration is appropriate "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop").

The Court has little doubt that Neal was handcuffed by Frayer, at least in part, because he refused to comply with the request to present his identification and was generally non-compliant when Caplan asked him questions, which Frayer was present to hear.  *See generally* Video Exhibit.

14

The Court gives this fact less weight in the reasonable suspicion analysis because Neal's "hesitations veered toward invoking rights he thought he might have rather than toward full defiance." *United States v. Johnson*, No. 21-cr-29, 2022 WL 2373700, at *16 (E.D. Va. June 30, 2022). However, Neal's assertion of his perceived rights does not change the fact that before he was handcuffed, Frayer already had reasonable suspicion to believe something was amiss based on the 911 call and what he observed immediately upon his arrival. Further, at the time Neal was handcuffed, officers had also developed additional reasonable suspicion that both Neal and Linthicum were drinking alcohol in public and that a "Special Police" car was being unlawfully operated without the proper license. Since officers had the right to detain (and handcuff) Neal, their subjective motivations for doing so are irrelevant to the Court's analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").[9]

## *ii.    Excessive Force*

Plaintiffs also allege that Frayer used excessive force in effectuating the *Terry* stop. *See* ECF 1, at 7–9. In considering an excessive force claim, the Court "employ[s] a standard of objective reasonableness, testing whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him." *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013) (citing *Scott*, 550 U.S. at 381). "This standard mandates 'a careful balancing' of Fourth Amendment rights 'against the countervailing governmental interests at stake.'" *Wilson v. Flynn*, 429 F.3d 465, 467–68 (4th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This analysis must be conducted in light of the "totality of the circumstances" surrounding the

---

[9] Plaintiffs do not challenge their frisk and subsequent search of their pockets and instead focus their claims on their handcuffing and detention. *See* ECF 1, at 8 ¶ 42, at 9 ¶ 47 (alleging excessive force through the restraint of Plaintiffs); *id.* at 11 ¶ 68 (alleging false imprisonment because Plaintiffs were "unlawfully and forcefully detain[ed]"). *See generally* ECF 26; ECF 27.

incident, including "'the severity of the crime at issue,' whether the 'suspect poses an immediate threat to the safety of the officers or others,' and whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight,'" as well as "[t]he extent of the plaintiff's injury." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (first quoting *Graham*, 490 U.S. at 397; then citing *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); and then citing *Pressly v. Gregory*, 831 F.2d 514, 517 (4th Cir. 1987)). The Court is obliged to evaluate the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

The Court has already established that the detention of Linthicum and Neal was justified as a *Terry* stop. "It is well established in this circuit that 'handcuffing a suspect . . . does not necessarily elevate a lawful [*Terry*] stop into a custodial arrest.'" *United States v. Ruffin*, 814 F. App'x 741, 749 (4th Cir. 2020) (quoting *Elston*, 479 F.3d at 320). "This is because '[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" *Id.* (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989)). The Fourth Circuit has explained that "the reasonableness of handcuffing a suspect during a *Terry* stop depends on whether doing so is 'necessary to maintain the status quo and protect [officer] safety.'" *Id.* (citing *Crittendon*, 883 F. 2d at 329). Regardless, the Court may consider that the encounter occurred without probable cause as it evaluates the overall reasonableness of the force used. *Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) ("But we consider the crime that is alleged to have been committed in connection with our overall analysis of all of the circumstances surrounding the use of force.") (emphasis added).

The Court has thoroughly reviewed the body camera footage of this incident and finds that there is no dispute of material fact, and the encounter between Frayer, Linthicum, and Neal did not

offend the Fourth Amendment.  As noted, under the specific facts presented here, Frayer had the right to temporarily detain Neal and Linthicum.  The officers, including Frayer, were investigating a possible abduction and encountered someone potentially impersonating law enforcement, a combination of undisputed facts that weigh against Plaintiffs.  Indeed, the Fourth Circuit has ruled that this first *Graham* factor regarding severity of the crime weighs in favor of law enforcement when even the slightest use of force is employed against an alleged victim.  *See Wilson*, 429 F.3d at 468 (finding that the alleged crime at issue, placing "[a] hand on [the alleged victim's] face" failed to result "in any significant physical harm, it still constitutes criminal activity").  Whether an immediate threat was posed by Neal and Linthicum is a slightly closer call as neither, at least initially, exhibited threatening behavior. Still, the nature of the alleged offense at issue coupled with the fact that one (or both) may have been impersonating law enforcement renders this factor, at best, equivocal.

As to the third *Graham* factor, concerning whether a suspect is "actively resisting arrest," *Jones*, 325 F.3d at 527, the video reflects that while neither suspect attempted to flee, neither did they cooperate with police.  Both refused to provide their names or identification.  *See, e.g.*, Video Exhibit, at 01:05–01:06, 02:00–02:15.  The undisputed video reflects that Neal actively resisted the handcuffing, *id.* at 02:24, a fact that, standing alone, weighs against Neal.  *See Wilson*, 429 F.3d at 468 (finding third Graham factor weighed in arresting officer's favor when the plaintiff "still disobeyed [the arresting officer's] orders and physically resisted when [officer] attempted to put [the plaintiff] in handcuffs").  The Fourth Circuit addressed a similar situation in *United States v. Ruffin*.[10]  There, a suspect was detained pursuant to *Terry* and refused to allow officers to

---

[10] The basis for the trial court's finding that reasonable articulable suspicion of criminal activity existed in *Ruffin* differs from the basis presented here. The Court cites *Ruffin* solely for its

place him in handcuffs by "straighten[ing] his arm out" and "pulling away." *Ruffin*, 814 F. App'x at 744. Likening the order to submit to handcuffs to "a lawful order from a public officer with which [the detainee] was required to comply under" the relevant North Carolina state law, the Fourth Circuit noted that the detainee's noncompliance gave officers "probable cause to arrest him for violation of N.C. Gen. Stat. § 14-223, which makes it unlawful to 'resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office.'" *Id.* at 750 (citations omitted).

Here, the undisputed video evidence reflects that when Frayer attempted to place Neal in handcuffs—as the Court has already determined he was lawfully permitted to do—Neal's arm stiffened and he resisted the effort to handcuff him. Similar to the situation in *Ruffin*, Neal's resistance arguably constitutes a violation of the relevant Maryland law against disobeying a lawful order, which holds that "[a] person may not willfully disobey any lawful order or direction of any police officer." *See* Md. Code Ann., Transp. § 21-103 (a)(1); *Cleary v. Green*, Civ. No. CCB-07-1202, 2008 WL 4900548, at *3 (D. Md. Nov. 6, 2008) (finding that a refusal to obey a lawful order by a police officer, "alone would warrant a reasonable officer to believe [a suspect was] violating Maryland law"). Of course, the video reflects that while Neal did, in fact, resist the efforts to handcuff him, his resistance was brief and largely ineffectual. Regardless, the fact remains that Neal *did* resist, and thus the third *Graham* factor weighs against him, even if only slightly so.

It bears noting that Frayer's efforts to subdue Neal are similar in nature to the practice endorsed by the Fourth Circuit in *Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017). There, the Fourth Circuit approved of an officer's performance of a "simple maneuver to ensure [the

---

discussion about a detainee's rights *after* he is lawfully detained, not for its determination on the question of reasonable articulable suspicion.

individual's] compliance," which involved "briskly, but safely, [taking the individual] to the ground . . . for less than a minute and no longer than the time [] needed to handcuff him." *Id.* at 120.  At no time did the officer "strike, kick, or verbally abuse" the individual.  *Id.*  And once the individual was handcuffed, the officer "refrained from any further physical contact."  *Id.*  "As a result of the encounter," the individual claimed "abrasions minor enough that he treated them at home . . . and did not seek medical assistance."  *Id.*  "An efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force."  *Id.*  So too here.  The video evidence shows that Frayer reacted swiftly and appropriately to Neal's non-compliance.  Frayer applied force to move Neal's arm behind his back and, after Caplan assisted in securing Neal's right arm behind his back, Frayer ceased physical contact and stepped away.  Video Exhibit, at 02:24–02:40.  Indeed, courts have found far more significant use of force to be reasonable when a detained suspect refuses to comply.  *See, e.g.*, *Hayat v. Diaz*, Civ. No. 20-02994-LKG, 2025 WL 475329, at *14 (D. Md. Feb. 12, 2025) (finding no excessive force when officers entered the plaintiff's home without authorization pursuant to a *Terry* stop, handcuffed the plaintiff, and took him "to the ground" when he resisted, resulting in the plaintiff suffering a bloody lip).

Finally, though the "severity of the physical injury resulting from the force used is but one 'consideration in determining whether force was excessive,'" *E. W. by & through T. W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018) (citing *Jones*, 325 F.3d at 528), Neal fails to point to any evidence suggesting any injury was more than de minimis.  It is true that Neal briefly yelled when Frayer turned Neal to face the car and twisted his left arm behind his back.  Video Exhibit, at 02:24–02:26.  But the video does not contain any additional indication that Neal suffered a significant injury or continued to experience pain following that moment.  *See id.* at 02:24–04:20.

Additionally, Neal has not attached to his opposition an affidavit or other evidence supporting a conclusion that he suffered any injury from the interaction. Neal "alleges no injuries, [and] no reasonable jury could find that the force used against [him] was more than 'nontrivial' or 'de minimis.'" *Brown v. Powell*, No. 4:12-CV-3057-DCN, 2014 WL 691662, at *5 (D.S.C. Feb. 21, 2014).

Finally, to the extent that Plaintiffs claim Frayer's handcuffing of Linthicum constituted excessive force, that claim similarly fails. Because Linthicum did not produce identification, Frayer placed Linthicum's arms behind his back and handcuffed him. Video Exhibit, at 01:05–01:28. Linthicum did not exhibit any external signs of pain or injury during the handcuffing. *See id.* Frayer's right hand then rested on Linthicum's arm for slightly under one minute as Frayer spoke to Linthicum, but no other physical contact took place related to the handcuffing. *Id.* at 01:30–02:22. If "[a]n efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force," then certainly Linthicum's detention did not constitute excessive force. *See Pegg*, 845 F.3d at 120. The Court also observes that Plaintiffs do not make arguments as to Frayer's contact with Linthicum in their opposition. *See generally* ECF 26; ECF 27. Neither did they make such arguments in the prior case. *See Caplan*, 2025 WL 608191, at *10. As Plaintiffs have failed to respond to the appropriateness of summary judgment with respect to claims by Linthicum against Frayer, they have abandoned them.

### iii.    Qualified Immunity

Even if there was a genuine dispute over the propriety of Frayer's actions, summary judgment is nonetheless warranted because Frayer is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The immunity [inquiry] balances two important interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (quoting *Pearson*, 555 U.S. at 231). "The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact." *Id.* (citing *Pearson*, 555 U.S. at 231). "It gives 'government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam)).

Qualified immunity "typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016) (internal quotation marks omitted). The second step of the analysis acknowledges that even officers who violate a plaintiff's constitutional rights may be entitled to qualified immunity, provided that the right in question is not so clearly established "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up) (citation omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Garrett v. Clarke*, 74 F.4th 579, 584 (4th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

"To determine whether a right is clearly established, [the Court must] assess whether the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 221

(4th Cir. 2018) (citing *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)).  "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity."  *Id.* (citations omitted).  However, courts are "not to define clearly established law at a high level of generality," as "[s]pecificity is especially important in the Fourth Amendment context."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal citations omitted).  "Defining the right at a high level of generality 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'"  *Atkinson*, 100 F.4th at 505 (citing Wesby, 583 U.S. at 63) (alteration in Atkinson).  "In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Reichle*, 566 U.S. at 664 (internal quotation marks omitted).

Frayer is entitled to qualified immunity not only because his actions failed to violate a constitutional right, but also because it is not clearly established that forceful handcuffing of a suspect offering resistance, albeit minimally so, necessarily violates the Fourth Amendment. Though the Supreme Court has not directly addressed whether the Fourth Amendment encompasses the right to be free from forceful handcuffing under circumstances analogous to the ones at issue here, it has acknowledged that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"  *Graham*, 490 U.S. at 396 (citing *Terry*, 392 U.S. at 22–27).  Moreover, "[n]ot every push or shove" violates the Fourth Amendment, even if it may later seem to have been unnecessary.  *Id.*

Courts in other circuits have found that forceful handcuffing does, in some instances, support an excessive force claim, at least when handcuffs are applied in an unreasonable manner. *See, e.g.*, *Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997) (finding it "clearly established"

that the "tight application of handcuffs was a violation of an arrestee's constitutional right not to have excessive force applied during an arrest"); *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (placing handcuffs on a suspect that were excessively tight and failing to respond repeated requests for them to be loosened, resulting in severe pain, were found to be excessive). However, the Fourth Circuit has found an officer's actions to be reasonable even when the officer handcuffed a generally compliant suspect and "dragged [her] into a [police] cruiser." *See Brown v. Gilmore*, 278 F.3d 362, 366 (4th Cir. 2002).[11] Plus, as noted above, *Pegg v. Herrnberger* arguably endorses the conduct at issue here, 845 F.3d at 120. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Having found that no "bright lines" were transgressed, Frayer is entitled to qualified immunity even if the Court were to find that his actions violated the Fourth Amendment with respect to either Neal or Linthicum.

### 2. State Law Claims Against Frayer

#### i. *Excessive Force*

Plaintiffs bring an excessive force claim under Article 24 of the Maryland Declaration of Rights. ECF 1, at 12 (Count V). Article 24 contains the State of Maryland's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 838 A.2d 1225, 1237 n.11 (Md. 2003). Article 24 is "the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013)

---

[11] The Fourth Circuit has extended qualified immunity to officers in an instance where the court found the underlying handcuffing to be excessively forceful. *See E.W. v. Dolgos*, 884 F.3d 172, 184, 187 (4th Cir. 2018) (finding it unreasonable to place a "calm and compliant" ten-year-old girl in handcuffs following an earlier school fight but finding that qualified immunity was warranted because the student's right not to be handcuffed "was not clearly established at the time of her seizure"). The facts of *Dolgos*, however, differ greatly from those here and thus do not clearly establish that forcibly handcuffing a detainee who offers minimal resistance is unlawful.

(quotation marks omitted).    Article 26, by contrast, is the Maryland analogue to the Fourth

Amendment.  *Padilla v. State*, 949 A.2d 68, 77 (Md. App. 2008); *see also Dent v. Montgomery*

*Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) ("Article 26 protects the same rights

as those protected under the Fourth Amendment to the United States Constitution . . . .").  Though

Plaintiffs' response to both motions for summary judgment contains no mention of Article 26,[12]

*see* ECFs 26 and 27, the Court has previously held that an "excessive force" allegation outside of

pre-trial detention must be raised under Article 26.  *See Graham v. Maryland*, 738 F. Supp. 3d

644, 655–56 (D. Md. 2024).

However, "[r]egardless of whether Plaintiffs' excessive force claims rest in Article 24 or

26, both articles will require the application of the Fourth Amendment."  *Id.*  In determining

whether a police officer has used excessive force under Maryland law, courts must look to

"whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances

confronting them."  *Cunningham v. Balt. Cnty.*, 232 A.3d 278, 314–15 (Md. App. 2020) (citing

*Graham*, 490 U.S. at 397; *Estate of Blair ex rel. Blair v. Austin*, 228 A.3d 1094, 1105–07 (Md.

2020)) (plurality opinion).

Article 26 is interpreted *in pari materia* with its federal analogue.  *See Stutzman v. Krenik*,

350 F. Supp. 3d 366, 377 (D. Md. 2018) ("Maryland courts construe Article 26 *in pari materia*

with the Fourth Amendment, such that its comparable provisions are essentially equated to the

Fourth Amendment's protections against unreasonable searches and seizures.").  Thus, the Court's

analysis of Plaintiffs' federal constitutional claim controls the disposition of Plaintiffs' claim under

---

[12] To the extent Plaintiffs alleged a "due process" claim under Article 24, the complaint later
clarifies that their allegations sound in Article 26.  *See* ECF 1, at 13 ¶ 83 (alleging that Frayer
"engaged in intentional acts of misconduct, including excessive force, and false imprisonment
which violated Mr. Neal's and Mr. Linthicum's civil rights and due process.").

the Maryland Declaration of Rights.  *See Middleton v. Koushall*, Civ. No. ELH-20-3536, 2024 WL 1967816, at *38 (D. Md. May 3, 2024).  Accordingly, for the reasons articulated above, *see supra*, Plaintiffs' claims fail.

ii.    *Battery*

Further, Plaintiffs' common law state tort claims "rise[] and fall" with Plaintiffs' Fourth Amendment claims.  *Titus v. Town of Nantucket*, 840 F. Supp. 2d 404, 417 (D. Mass. 2011); *see also Stutzman*, 350 F. Supp. 3d at 383 (holding in the context of gross negligence claims alleging excessive force that the principle of objective reasonableness articulated in *Graham v. Connor* controls); *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 815 (E.D.N.C. 2015) (noting "assault and battery by a law enforcement office may provide the basis for a civil action for damages so long as the plaintiff can show that the force used was excessive under the circumstances"); *Main v. Wingler*, Civ. No. 22-157, 2024 WL 871384, at *9 (W.D.N.C. Feb. 29, 2024) ("The Fourth Circuit has recognized that [] 'the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence.'" (first quoting *Njang v. Montgomery Cnty.*, 279 F. App'x 209, 216 (4th Cir. 2008); and then citing *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998))); *Bell v. Dawson*, 144 F. Supp. 2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, Civ. No. 13-732, 2016 WL 866327, *10 (E.D.N.C. Mar. 3, 2016) ("Where a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims."); *Holman v. Wiggs*, Civ. No. 23-618, 2024 WL 2784919, at *7 (M.D.N.C. May 30, 2024) ("Thus, '[w]here a plaintiff brings both a § 1983 excessive force claim and a common law claim for assault and battery, the court's determination of the reasonableness of the force used with respect to the § 1983 claim controls its assault and battery analysis,' at least insofar as constitutionally excessive force will be deemed to constitute a battery." (citation omitted)); *Rovin*

*v. State*, 321 A.3d 201, 227 (Md. 2024) ("Stated another way, we apply the same principles of 'objective reasonableness' underlying the application of a Section 1983 qualified immunity determination when considering whether a plaintiffs arrest was objectively reasonable, which would defeat the common law claims and constitutional claims arising from the same conduct as a matter of law."). Having found Frayer's conduct to be objectively reasonable, *see supra*, Plaintiffs' common law battery claim also fails.

As the Court has determined that Frayer's conduct was objectively reasonable, it is not necessary for the Court to reach the issue of whether Defendants are entitled to immunity for their state tort law claims. However, there too, Plaintiffs' battery claim would fail. "In Maryland, public official immunity applies to torts consisting of 'negligence actions or defamation actions based on allegedly negligent conduct.'" *Phelan v. Atack*, Civ. No. TDC-19-1867, 2020 WL 7043931, at *3 (D. Md. Dec. 1, 2020) (citing *Lee v. Cline*, 863 A.2d 297, 305 (Md. 2004)). "Police officers are deemed to be public officials for purposes of public official immunity." *Id.* (citations omitted). However, public official immunity is not available in actions alleging intentional torts such as false imprisonment, assault, or battery. *Thomas v. City of Annapolis*, 688 A.2d 448, 454 (Md. App. 1997) (citing *Ashton v. Brown*, 660 A.2d 447, 470 (Md. 1995)); *see also Houghton v. Forrest*, 989 A.2d 223, 229 (Md. 2010). Moreover, the applicable statute, § 5-507 of the Maryland Courts & Judicial Proceedings Article, merely "codif[ies] existing public official immunity and [does] not [] extend the scope of qualified immunity beyond its Maryland common law boundaries." *Lovelace v. Anderson*, 785 A.2d 726, 734 (Md. 2001) (first citing *Ashton*, 660 A.2d at 470 n.23; and then citing Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1)).

Though the Maryland public official immunity doctrine is "quite limited" and applicable only "in negligence actions or defamation actions based on allegedly negligent conduct," *Lee*, 863

A.2d at 305, this does not mean that Plaintiffs have viable tort claims against Frayer.  Under Maryland law, "false imprisonment, false arrest, and assault and battery 'can only occur when there is no legal authority or justification for the arresting officer's actions.'"  *Hines v. French*, 852 A.2d 1047, 1055 (Md. App. 2004) (quoting *Williams v. Prince George's Cnty.*, 685 A.2d 884, 898 (Md. App. 1996)).  Legal justification is understood to be "equivalent to legal authority."  *Id.* (quoting *Great Atl. & Pac. Tea Co. v. Paul*, 261 A.2d 731, 738 (Md. 1970)).  As detailed above, Frayer acted with legal authority.  Therefore, Plaintiffs do not have a colorable battery claim against Frayer, regardless of the applicability of state public official immunity.

### B.    Mount Rainier

In adopting the arguments of Frayer, Mount Rainier argues that summary judgment is warranted in its favor because it is warranted against Frayer.  *See* ECF 24.  Unlike municipalities pursuant to § 1983, "local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from [Maryland] Constitutional violations committed by their agents and employees within the scope of the employment."  *DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999). However, as explained above, because the Court holds that Frayer is not liable to Plaintiffs for any conduct that occurred during the August 2, 2021 encounter, Plaintiffs' *respondeat superior* theory of liability for Mount Rainier necessarily fails.[13]   Accordingly, Mount Rainier is entitled to summary judgment as well.

---

[13] Moreover, even if Plaintiffs sought to hold Mount Rainier liable for its own conduct under Article 24, Plaintiffs have made no such arguments in their opposition, *see generally* ECF 27-1, nor have they produced any evidence to the Court of Mount Rainier's customs, policies, or practices.

## IV.    <u>RULE 11 SANCTIONS</u>

As a final matter, the Court observes that there are several troubling citations in Plaintiffs' opposition to Mount Rainier's motion for summary judgment.  *See* ECF 27.  For example, Plaintiffs cite "*Brown v. Daniel Realty Co.*, 922 A.2d 1146, 1155–56 (Md. Ct. Spec. App. 2007)" for the proposition that courts generally construe Article 24 of the Maryland Declaration of Rights "*in pari materia* with federal constitutional standards."  ECF 27-1, at 3.  However, the citation appended to *Brown* is incorrect.  That reporter information instead closely corresponds to a case from the Appellate Court of Connecticut, *Wu Chen v. Bernadel*, 922 A.2d 1142 (Conn. App. 2007).  There is an Appellate Court of Maryland opinion by the name of *Brown v. Daniel Realty Co.*, 949 A.2d 6 (Md. App. 2008), *aff'd*, 976 A.2d 300 (Md. 2009).  However, neither the Appellate Court opinion nor the Maryland Supreme Court opinion that affirmed that case stand for the proposition that Plaintiff seeks to support.  The Appellate Court's opinion in *Brown* mentions "*in pari materia*" to describe reading Rule 2-416(a) and Rule 2-419(a)(4), two Maryland rules of civil procedure related to discovery, "in a manner that harmonizes the two rules."  949 A.2d at 14.  Article 24 of the Maryland Declaration of Rights is nowhere mentioned in either case.  *See generally id.*

Moreover, Plaintiffs' counsel cites and purports to quote "*Gottfredson v. Hoyer*, 492 F. Supp. 2d 399, 405 (D. Md. 2007)," for the proposition that "[c]ollateral estoppel requires that the party against whom preclusion is invoked had a 'full and fair opportunity' to litigate the same issues in the prior suit."  ECF 27-1, at 4.  However, the Court has not been able to locate a case by the name of *Gottfredson v. Hoyer* from this District.  Rather, the reporter information provided corresponds with a case from the Southern District of New York, *Brenner v. Heavener*, 492 F. Supp. 2d 399 (S.D.N.Y. 2007).  *Brenner* is a case involving excessive force and false imprisonment claims under 42 U.S.C. § 1983, among other claims, but it nowhere mentions collateral estoppel or issue preclusion.  *See generally id.*  For the same proposition, Plaintiffs'

counsel later cites "*Adams v. Rice*, 40 F.3d 72, 74–75 (4th Cir. 1994)." ECF 27-1, at 4–5. That case exists, but it too does not discuss collateral estoppel or issue preclusion. *See Adams*, 40 F.3d at 74–75 (reviewing a district court's dismissal of a frivolous complaint under the federal *in forma pauperis* statute, 28 U.S.C. § 1915).[14]

This is not the first time Plaintiffs' counsel has included inaccurate citations in a filing before this Court. In an unrelated case, *Lafferty v. Theiss et al.*, Civ. No. 24-2642-SAG, the opposing counsel alleged several troubling misrepresentations of citations and case content made by Plaintiffs' counsel in a filing. *See* Civ. No. 24-2642-SAG ECF 26, at 4–8 (allegations in defendants' counsel's reply brief filed April 29, 2025), ECF 27 (May 12, 2025 paperless order directing Plaintiff to respond to allegations). Plaintiffs' counsel submitted a response to the Court's order to respond to the allegations on May 26, 2025, Civ. No. 24-2642-SAG ECF 28 (May 26, 2025), in which he withdrew several phrases and quotes from his earlier filing, admitted to errors in performing legal research, and specifically identified a number of protocols the firm had implemented to "ensure such an error never recurs." *Id.* at 5–6.

"A court may sanction an attorney who has violated Rule 11(b), and the court may do so on its own initiative." *Kruglyak v. Home Depot U.S.A., Inc.*, 774 F. Supp. 3d 767, 769 (W.D. Va.

---

[14] Plaintiffs' counsel also cites to a page of a Maryland Appellate Court opinion that does not exist. *See* ECF 27-1, at 6 (citing "*Baltimore Police Dep't v. Cherkes*, 780 A.2d 410, 447 (Md. Ct. Spec. App. 2001)," a case which ends on page 440 of the second edition of the Atlantic Reporter). However, at least that case contains the proposition for which Plaintiffs' counsel cites it. *See Cherkes*, 780 A.2d at 439.

Additionally, in addressing "*Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003)" in Plaintiffs' opposition to Frayer's motion, ECF 26-1, at 9, Plaintiffs' counsel described the case in an explanatory parenthetical as "finding that 'a minimal level of force' can still violate constitutional rights when deployed without justification," *id.* That purported quote does not appear on the page Plaintiffs' counsel cites, nor does it appear anywhere else in the opinion. Indeed, *Jones* involved a case in which the officer "knocked [the defendant] to the floor and jumped on him, breaking his nose, lacerating his face, and bruising his ribs." *Jones*, 325 F.3d at 528, 530.

2025) (quoting *UBS Fin. Servs., Inc. v. Childress*, 2013 WL 5786444, at *3 (W.D. Va. Oct. 28, 2013)); Fed. R. Civ. P. 11(c)(3) ("On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)."). Rule 11(b) provides in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law . . . .

Fed. R. Civ. P. 11(b). "However, before a court may do so, it must issue a show cause order[.]" *Kruglyak*, 774 F. Supp. 3d at 769; *see also In re Bees*, 562 F.3d 284, 289 (4th Cir. 2009) ("Rule 11 requires a district court to order counsel 'to show cause why conduct specifically described in the order has not violated Rule 11(b)' prior to imposing *sua sponte* sanctions in order to allow counsel to respond to specific asserted Rule 11 violations." (quoting Fed. R. Civ. P. 11(c)(3))). The Fourth Circuit has held that "a court is obliged to use extra care" in issuing a *sua sponte* show cause order and has observed that the "Advisory Committee contemplated that a *sua sponte* show cause order would only be used 'in situations that are akin to a contempt of court.'" *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 151 (4th Cir. 2002) (italicization added) (quoting Fed. R. Civ. P. 11, note). Courts within the Fourth Circuit have issued *sua sponte* show cause orders where a party appears to have "cited to fictitious cases and misrepresented the holding of various cases" in a filing. *See, e.g.*, *Kruglyak*, 774 F. Supp. 3d at 770; *In re Richburg*, 671 B.R. 918, 921 (Bankr. D.S.C. 2025).

Despite having ample reason to do so, the Court will not *sua sponte* issue a show cause order in this case. Plaintiffs' opposition to Mount Rainier's motion for summary judgment, ECF 27, was filed on March 26, 2025, and the Court observes that Plaintiffs' counsel represented to

Judge Gallagher on May 26, 2025 that several new protocols had been implemented at counsel's firm to ensure that Rule 11's standards are met before filings are made in this Court.  Though it is unfortunate that counsel did not take the opportunity to revisit filings in other case to ensure that the same errors that plagued the filings in *Lafferty* were not present in other cases, the Court assumes that the erroneous citations offered in Plaintiffs' opposition here were a result of the prior practices detailed in Plaintiffs' counsel's response to Judge Gallagher's order and thus have been properly addressed by the steps noted in the response filed in *Lafferty*.

To confirm its suspicion that generative AI played a role counsel's errors, the Court ran the questionable citations in this case through several well-known generative AI platforms and found generated content including references to the cases cited by Plaintiffs despite the fact that the cases either did not exist at all or did not stand for the propositions that the generative AI platform said they did.  For example, one platform provided a detailed description of the trial court's findings in *Gottfredson v. Hoyer*, 492 F. Supp. 2d 399 (D. Md. 2007), despite the fact that no such case exists. That same platform noted that *Adams v. Rice*, another case erroneously cited by Plaintiffs, dealt with the "important issue . . . of collateral estoppel" despite the fact that, as noted, the case actually "present[ed] the question [of] whether the district court abused its discretion under 28 U.S.C. § 1915(d) by dismissing plaintiff's in forma pauperis suit as frivolous."  40 F.3d 72, 73 (4th Cir. 1994).  Thus, it appears that these "[f]ake or nonexistent legal citations" are the likely "result of AI 'hallucinations,'" which the Appellate Court of Maryland recently described as "inaccurate depictions of information from AI models that suffer from incomplete, biased, or otherwise flawed training data."  *Mezu v. Mezu*, No. 361, Sept. Term, 2025, 2025 WL 3022460, at *3 (Md. App. Oct. 29, 2025) (quoting *Noland v. Land of the Free, L.P.*, 336 Cal. Rptr. 3d 897, 911 (Cal. App. 2025)).

As Maryland's intermediate appellate court noted, the practice of "[s]ubmitting fake cases to the court in a legal brief or other pleading can result in multiple harms." *Id.* at *5. Most relevant here, "in addition to detracting from counsel's credibility . . . [c]ounsel's conduct here also required this Court to take time to try to find the fake cases cited in [Plaintiffs'] brief, . . . diverting judicial resources from other pressing work." *Id.* However, given the representation made to Judge Gallagher in the *Lafferty* case, *see* Civ. No. 24-2642-SAG ECF 28 (May 26, 2025), the Court here is content that such practices have now been rectified. Specifically, counsel noted in his response in *Lafferty* that "[a] junior associate in [counsel's] office gathered initial authorities using a commercial electronic research platform that delivers suggested pin-cite quotations" and counsel admitted to failing "to perform the independent, line-by-line verification [Fed. R. Civ. P.] 11(b)(2) requires before signing and filing the brief." *Id.* at 5. Counsel acknowledged that "verification duty is personal and cannot be delegated," apologized to the Court and opposing counsel, and noted that "[t]he exclusive reliance upon artificial intelligence in [counsel's firm's] briefing is now prohibited and the review of documents before their filing has taken on new importance." *Id.* Counsel also listed a series of protocols implemented to ensure that reliance on hallucinated authority does "not recur." *Id.* at 5–6. Given that counsel has obviously undertaken serious efforts to correct the error and is sufficiently remorseful for the improper use of generative AI, the Court finds that no additional action is warranted.[15] However, Plaintiffs' counsel is warned that future

---

[15] The Court notes that the Maryland Appellate Court chose to refer counsel in *Mezu* to the Attorney Grievance Commission for the repeated citations to fake cases in filings. *Mezu*, 2025 WL 3022460, at *6. However, the offending counsel in *Mezu* apparently did not offer appropriate assurances that the offending behavior was isolated and revealed that citations to "multiple cases that did not exist, as well as others that did not support the proposition for which they were cited," may have been a symptom of a much larger problem. *Id.* ("When asked at oral argument about the concern when a lawyer obviously has not read the cases cited to the court, counsel indicated that this was not a unique circumstance, stating that he typically did not read the cases he cited in pleadings submitted to the court."). In contrast to *Mezu*, the Court finds that counsel's assurances

filings containing erroneous citations of the type exemplified here may ultimately lead to the issuance of sanctions under Rule 11.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions for summary judgment are granted.

A separate implementing order will issue.


Dated: <u>November 17, 2025</u>                    <u>            /s/            </u>
                                                              Brendan A. Hurson
                                                              United States District Judge

---

here adequately address the errors and is confident that the steps implemented, as summarized in *Lafferty*, represent appropriate corrective measures such that no additional action should be taken at this time.